### In re STECKLER.

(Supreme Court, Appellate Division, First Department. November 10, 1911.)

ATTORNEY AND CLIENT (§ 44*)—DISBARMENT—MISAPPROPRIATION OF FUNDS.

   An attorney should be disbarred for inexcusable misappropriation of funds received by him for immediate distribution as attorney for an executor.

   [Ed. Note.—For other cases, see Attorney and Client, Cent. Dig. §§ 55, 56, 62; Dec. Dig. § 44.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Disbarment proceeding against Louis Steckler. Respondent disbarred.

See, also, 142 App. Div. 904, 126 N. Y. Supp. 1147.

Argued before INGRAHAM, P. J., and CLARKE, McLAUGHLIN, SCOTT, and DOWLING, JJ.

Arthur S. Hamlin, for petitioner.

George Gordon Battle, for respondent.

INGRAHAM, P. J. The charges in this case referred to the appropriation or disposition of certain property of the estate of one Lina Matthias which came into the respondent's hands as attorney for the executors and legatees under her will. The estate amounted to about $2,700 in personal property, consisting of savings bank accounts and a bond secured by a mortgage upon real property in the city of New York. After the execution of the will by the decedent, she attempted to modify the will, by a codicil, which, not having been executed in accordance with law, could not be admitted to probate. The will, however, was admitted to probate, and letters testamentary issued to one Geib on May 20, 1908. The legatees named in the will were two residents of this state and three persons residing in Germany. The respondent was retained by the executor and others interested in the estate to have the will probated and to perform the proper professional services in collecting the assets and closing up the estate. There was no trust created by the will, and it was the duty of the executor to promptly collect the assets, pay debts and expenses, and distribute the balance among the legatees. Upon the same day that the will was admitted to probate, namely, May 28, 1908, the legatees and creditors in this country executed an agreement, which, in substance, provided: That the said Geib was to act as the executor of the estate. That in acting as such executor he was to carry out all the provisions of the will as well as of this alleged codicil, and that all moneys of the estate were to be turned over to Louis Steckler (the respondent) as attorney of the estate of the late Lina Matthias to be distributed by him as agreed upon as follows. Then followed the various payments to be made to the creditors, including the funeral expenses and expenses in connection with the winding up of the estate. That he was to collect as soon as possible a mortgage of $1,750 held by the decedent and the life insurance due to the estate. That he was to wind up the estate as expeditiously as possible, prepare the final accountings, and, pursuant to such final accounting, distribute the balance due according to the will of the testatrix. This agreement was signed by the creditors and legatees in this state and also by the respondent. Acting under the authority contained in this instrument, the respondent proceeded to collect the money due the estate. He received from the savings banks the sum of $836.09 which he deposited in the Carnegie Trust Company in his own account. In June he collected $34 from an insurance company, and on August 11, 1908, collected the mortgage which, with interest, amounted to $1,843.17. The total collections amounted to $2,713.20. Between June and August he paid out for funeral expenses, a legacy to Woodlawn Cemetery, and to a legatee

and creditors a total of $436.85. Thus by August 11, 1908, he had received all the property of the estate, and had it in his hands in cash. Under the agreement which he signed he was immediately upon realizing the estate to distribute it among those interested. He had nothing to do with investing any of the money. He did not hold it as trustee upon any trust, but simply as an attorney to collect on behalf of his clients, the executor and legatees of the estate, the money coming due and distribute it when collected to those entitled to it. There is no possible excuse for his disposing of this money in any way except in accordance with the agreement and the will of the testatrix.

The respondent was admitted to practice in 1886, and had therefore been a practicing lawyer for upwards of 20 years. He drew all of these agreements, procured it to be executed, presumably knew its contents, and it must be assumed that he correctly appreciated his duty to his clients, having reduced the estate to money on August 11, 1908. The creditors and legatees wanted what was due them, and commenced to make demands upon the respondent for their share of the money in the fall of 1908. No distribution of the estate was attempted until December, 1908, when the respondent gave several checks upon the Lafayette Trust Company of Brooklyn, which trust company had on November 30, 1908, suspended payment, and the banking department had taken possession of its assets. Of course, these checks were never paid, and there is nothing to show that the respondent had any money in this trust company to pay the checks. Subsequently, on June 7, 1909, he drew three checks for $200 each, and sent them to the legatees in Germany, who were entitled to a portion of the estate. These checks were drawn on the Carnegie Trust Company of the city of New York, and, when returned, they were not paid. I cannot find any evidence that there were funds in the Carnegie Trust Company to pay these checks, but the respondent testified that he instructed the Carnegie Trust Company not to pay them because a release that he had sent with the checks had not been signed and returned with them. Proceedings were subsequently commenced in the Supreme Court to compel the respondent to pay the moneys of the estate that he had collected. These proceedings were begun on August 27, 1909, and on September 18, 1909, a referee was appointed by the Special Term of the Supreme Court. On January 9 and April 16, 1910, the respondent paid to the attorney for the executor who instituted this proceeding various sums aggregating $900, leaving a balance of $1,367.37 unpaid. On July 19, 1910, a notice of hearing before the grievance committee of the bar association was served upon the respondent, and on July 22, 1910, he paid to the attorney for the executor the balance of the claim against him.

Here was a palpable misappropriation of the money of this estate received by the respondent as attorney for the executor under a specified agreement by which he was to collect the money, and promptly distribute it. It was as much a breach of trust for him to attempt to invest this money as to make any other disposition of it. The duty of the respondent was so clear that it is asking too much for the court to believe that he considered that he had any duty to invest the

money to procure an income, or make any other disposition of it, except a distribution among the creditors and legatees of the decedent. What the parties interested in this estate wanted was the money to which they were entitled. They had intrusted the respondent as an attorney of this court to collect this money and distribute it, and that he assumed to do. He collected the money, but the only attempt he made at distribution was to give checks upon a trust company which had failed, or a trust company in which he had no money, and the checks were not paid. Of course, such misconduct requires this court to disbar an attorney unless an explanation as to his misconduct is presented which justifies the court in excusing his fault.

The respondent, having the money in his possession from August, 1908, in December came to the conclusion, as he says, that "the only way that I would pay these moneys would be if all parties in interest would in writing consent to the distribution." He then drew up an agreement which was executed by the heirs in this country in December, 1908, and the heirs abroad in February, 1909. Having received this agreement for distribution, which would seem to have then required an immediate distribution, he sent these checks on the Carnegie Trust Company, where he had no money to pay them, and which were in fact not paid. By this agreement each of the German legatees would receive $200, and the checks on the Carnegie Trust Company that the respondent sent were for that sum. The respondent's excuse for the nonpayment of the checks was that with them he sent a general release to be executed by the payees, that they attempted to collect the checks without returning the releases, and that he thereupon did not provide money at the Carnegie Trust Company to pay the checks. When these checks were sent and these agreements executed, there was no statement that the money had been invested, or that there would be any delay in payment except the execution of the papers and releases; but the execution of the releases was entirely unnecessary, as each of the German legatees had agreed to accept the sum of $200 in full payment of their legacy.

The main excuse, however, offered by the respondent, relates to the investment of this money. He said that when he received the money from the savings bank, and before he had collected the $1,750 mortgage, he considered it his duty to invest the money. So far as appears, he did not speak to the executor of the estate for whom he was acting of his duty to make an investment, or to any of the legatees or creditors; but went to one Pelletreau, who, respondent says, was in the real estate business, and a man of great means. He then had between $300 and $350 of the money of the estate in his possession. The respondent arranged with Pelletreau to deposit with him, on what he called a "participating interest" in a mortgage on the Curlew Hotel in New Jersey, an amount up to $2,500, the respondent to get 6 per cent. interest as he deposited it with Pelletreau from time to time. The respondent says he gave Pelletreau $350 at one time, and then gave him the proceeds of the second mortgage less the expenses, making a total of about $2,100. So far as appears, he did not attempt to collect any of this money from Pelletreau until the proceedings had

been commenced against him at Special Term, when he got from Pelletreau $700 at one time and $200 at another, and these two sums of money he paid over to the attorney for the executor. After he had paid up the balance of the money to the executor, he got after Pelletreau, and he delivered up his participating interest in the Curlew Hotel for an interest in another matter in which Pelletreau and the respondent were interested. Pelletreau is dead. No participating agreement is presented. There was no examination of the property upon which this participating agreement gave a lien; no examination of the original mortgage or instruments giving a lien; nothing but a statement by Pelletreau and a payment by the respondent to Pelletreau of the money of this estate. The respondent did not know how much this mortgage or lien upon which he was to have "a paramount participating interest" was, and knew nothing about it except what Pelletreau told him, and took from Pelletreau this participating agreement. The only evidence that the respondent ever paid any money to Pelletreau was his own uncorroborated testimony. He seemed to have been very willing to draw checks on banks in which he had no money to pay the legatees and creditors of this estate; but, when he paid this $2,100 to Pelletreau, it was all paid in cash. The first of these investments was made within a day or two after the moneys had been collected from the savings bank, and then from time to time thereafter as Pelletreau wanted the money the respondent paid it to him, and in each instance in cash. He produces no account with the Carnegie Trust Company to show that these payments were made. He had a register in which they were entered, but that register has mysteriously disappeared. It was then proved that this hotel mortgage was a mortgage made to one Miles, and that Miles borrowed money from Pelletreau and assigned this mortgage as security for these loans, which aggregated something like $13,000. The witness Winans, who was present at an interview between the respondent and Pelletreau, remembers that Pelletreau told the respondent that this hotel was a first-rate thing; that one Miles, who seemed to be interested in the hotel, would not be able to pull the hotel through, and Pelletreau was negotiating with the respondent to purchase the mortgage on the property, and was urging the respondent to make an investment as it would pay him the highest rate of interest, was perfectly safe, and, besides, would be of personal assistance to Pelletreau; that the effect of what was said was that the respondent was going to buy the mortgage from Pelletreau. But whatever Pelletreau's connection with this loan was, or the respondent's connection with Pelletreau, it is entirely clear that this so-called investment was not an investment of trust funds and was never intended to be; that it was not an investment of money for the benefit of these legatees and creditors, who under the agreement that the respondent had signed were entitled to a distribution of the funds as soon as received, but an investment in a hotel speculation in New Jersey where no mortgage or obligation was received by respondent except the mere receipt of a real estate speculator and promoter, and, even if made, as respondent testifies, it was but an investment of estate funds from which it was

hoped that respondent might ultimately derive some personal advantage.

It seems to me entirely evident that this excuse for the appropriation of the money received by the respondent cannot be considered as in any way justifying the offense. We have in this case a plain appropriation of money received by the respondent as attorney for a specific purpose, an appropriation which was clearly a misappropriation and entirely unjustified, and under the circumstances the respondent must be disbarred. All concur.